Kalpana Srinivasan (CA SBN 237460)
ksrinivasan@susmangodfrey.com
Krysta Kauble Pachman (CA SBN 280951)
kpachman@susmangodfrey.com
Jesse-Justin Cuevas (CA SBN 307611)
jcuevas@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, 14th Floor
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Max L. Tribble, Jr. (CA SBN 326851)
mtribble@susmangodfrey.com
David Peterson (TX SBN 24056123)
dpeterson@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Michael F. Heim (TX SBN 9380923)
mheim@hpcllp.com
Eric Enger (TX SBN 24045833)
eenger@hpcllp.com
Blaine Larson (TX SBN 24083360)
blarson@hpcllp.com
William B. Collier, Jr. (TX SBN 24097519)
wcollier@hpcllp.com
**HEIM, PAYNE & CHORUSH, LLP**
1111 Bagby St., Suite 2100
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Attorneys for Plaintiff Intellectual Pixels Limited

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| INTELLECTUAL PIXELS LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC;<br><br>Defendant. | Case No. 8:19-cv-01432-JVS-KES<br><br>**PLAINTIFF INTELLECTUAL PIXELS LIMITED'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>**DEMAND FOR JURY TRIAL** |

# Table of Contents

I.   Overview of Patented Technology ........................................................................ 1

II.  Legal Standard ..................................................................................................... 2

III. Disputed Terms for Construction ........................................................................ 3

    A.   3-dimensional graphics ................................................................................ 3

    B.   3-dimensional graphics processing ............................................................. 7

    C.   Does not perform 3-dimensional graphics processing ............................ 11

    D.   Transmitting a link to identify the client device .................................... 13

    E.   Image-modifying data ................................................................................ 15

    F.   Complex interactive games ....................................................................... 21

    G.   Acceptable frame rate ............................................................................... 23

IV.  Conclusion ......................................................................................................... 25

1

# Table of Authorities

2

## Cases

3

*3M Innovative Props. Co. v. Tredegar Corp.*

4

    725 F.3d 1315 (Fed. Cir. 2013).................................................................. 8

5

*Avid Tech., Inc. v. Harmonic, Inc.*

6

    812 F.3d 1040 (Fed. Cir. 2016).................................................. 9, 17, 21

7

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*

8

    183 F.3d 1334 (Fed. Cir. 1999).................................................................. 2

9

*Cordis Corp. v. Medtronic AVE, Inc.*

10

    339 F.3d 1352 (Fed. Cir. 2003).......................................................... 9, 17

11

*Cox Comm., Inc. v. Sprint Comm. Co.*

12

    838 F.3d 1224 (Fed. Cir. 2016)................................................................ 21

13

*Guandong Alison High-Tech Co. v. ITC*

14

    936 F.3d 1353 (Fed. Cir. 2019)................................................................ 24

15

Innova*/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*

16

    381 F.3d 1111 (Fed. Cir. 2004).................................................................. 3

17

*Markman v. Westview Instruments, Inc.*

18

    517 U.S. 370 (1996).................................................................................. 2

19

*Mentor Graphics Corp. v. EVE-USA, Inc.*

20

    851 F.3d 1275 (Fed. Cir. 2017)................................................................ 24

21

*Nautilus, Inc. v. Biosig Instruments, Inc.*

22

    572 U.S 898 (2014).................................................................................. 21

23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*

24

    521 F.3d 1351 (Fed. Cir. 2008)................................................................ 14

25

*Omega Eng'g, Inc. v. Raytek Corp.*

26

    334 F.3d 1314 (Fed. Cir. 2003).......................................................... 9, 17

27

*One-E-Way, Inc. v. ITC*

28

    859 F.3d 1059 (Fed. Cir. 2017)................................................................ 24

*Phillips v. AWH Corp.*

    415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... 3

*Trivascular, Inc. v. Samuels*

    812 F.3d 1056 (Fed. Cir. 2016) ............................................................... 9, 17

**Statutes**

35 U.S.C. § 112 ........................................................................................................ 2

IPL'S OPENING CLAIM CONSTRUCTION BRIEF

Plaintiff Intellectual Pixels Limited ("IPL") is the owner of the four Patents-in-Suit—Patent Nos. 7,587,520 ("the '520 Patent"), 8,131,826 ("the '826 Patent"), 8,667,093 ("the '093 Patent"), and 9,699,238 ("the '238 Patent"). Exs. 1-4. These Patents are based on technology developed by 3Dlabs, an early pioneer in the graphics-processing industry. Among other innovations, 3Dlabs developed and sold the industry's first workstation-class single chip 3D graphics processor for use in personal computers. Many PC companies have included 3Dlabs' 3D graphics processors in their products, including Dell, HP, IBM, and Compaq. The inventors of the Patents-in-Suit are co-founders of 3Dlabs (Osman Kent) and its chief architects (David Baldwin and Nick Murphy). Osman Kent is an owner of IPL.

## I.    Overview of Patented Technology

The Patents-in-Suit relate generally to a networked system in which one or more client computers are in selective communication with a remote visual server having 3-dimensional graphics processing capabilities. '238 at Abstract. The system is configured to allow a client to use the server's resources to execute an application—such as a video game—and perform 3D graphics processing to generate images. *Id.* at 3:35-42. As a result, the client does not need to execute or even possess a copy of the application locally. Further, the client does not need to itself perform the complex 3D graphics processing required to produce 3D graphics generated by the application running on the server.

The client computer includes an input device through which input signals can be generated to control a user's interaction with the image currently displayed at the client. *Id.* at 3:52-55, 4:12-15, 4:61-63. The client collects the input data signals and transmits them to the server over a network, which receives and processes those input signals to modify the existing state of the game (or other) application. *Id.* at 3:48-49; 4:16-20; 6:28-29. After the server updates the game state, it uses its 3D graphics processing capabilities to render the image that results from the updated game state. *Id.* at 3:39-42; 3:55-61. The server's 3D rendering operation produces an updated

graphical image that contains color values for each pixel that will be displayed on a 2D display screen, while providing the appearance of a 3D image. However, rather than displaying those pixel values, the server compresses that image data and transmits it to the client, where the client computer decompresses the image data and displays the image frame. *Id.* at 3:55-64. This process is repeated many times per second according to the target frame rate of the system. Thus, for example, if the system is designed with a frame rate of 30 frames per second, a new frame of image data is generated, compressed, and transmitted 30 times each second.

The visual server may include an array of servers that are available to host applications such as video games for one or more clients. *Id.* at 3:35-44; 5:54-6:4; 7:7-18. The client computer sends a message to the server requesting to play a game using the server's resources. The server receives this request and in response makes any necessary resource allocations to support the hosting of a video game or other application for that particular client. *Id.* at 7:40-48. Once the necessary allocation is made to support hosting a game for a client, the game play ensues by receiving input signals from the client computer as the client interacts with the game application executing on the allocated server resource. In response to the input signals from the client, the allocated server resource updates the game state and generates a new modified image that it compresses and transmits to the client. If the game supports 3D graphics, the server performs the 3D processing and renders new image frames for delivery to the client. The client receives and processes these new image frames by decompressing the compressed frames and displaying the images on the local display of the client. *Id.* at 3:55-64.

## II.   Legal Standard

The scope of a patent is determined by its claims. 35 U.S.C. § 112, ¶ 2; *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Pursuant to *Markman v. Westview Instruments, Inc.*, the Court construes the scope and meaning of disputed claim terms as a matter of law. 517 U.S. 370, 389-90 (1996).

1  Patents are presumed to be written for persons skilled in the field of the invention.

2  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*). For that

3  reason, the proper construction of a disputed claim term requires interpreting the term

4  as it would be understood by a skilled artisan at the time of the invention, with a

5  primary focus on the claim language and specification. *Id.* at 1311-13; *Innova/Pure*

6  *Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

7  **III.     Disputed Terms for Construction[1]**

8       There are three terms in the '093 and '238 Patents that generally relate to 3D

9  graphics: (1) "3-dimensional graphics"; (2) "3-dimensional graphics processing";

10  and (3) "does not perform 3-dimensional graphics processing". The term "3-

11  dimensional graphics," more commonly referred to as simply "3D graphics," is used

12  in the Patents according to its ordinary and customary meaning to refer to graphical

13  images that are produced by the processing of 3D geometric objects—that is, objects

14  that have a 3-dimensional geometry. Claim 1 of the '093 Patent is representative of

15  the context within which these terms are used in the claims.

16       The claims explicitly require that the server generates 3D graphics. '093,

17  claim 1. When playing an interactive game, which is the context of '093 claim 1,

18  the game application runs on the server. The client transmits user input control

19  signals to the game application, and the server performs 3D graphics processing to

20  generate images that result from those input control signals. The images are

21  compressed at the server and transmitted to the client device as a stream. The client

22  device decompresses the images from the stream and displays them, without

23  performing 3D graphics processing on the decompressed image.

24       **A.     3-dimensional graphics**

25       The term "3-dimensional graphics" has a well understood meaning within the

26  computer graphics industry. Ex. 8 ("Hart") at ¶ 15; *see* Ex. 9 ("Fuchs") at ¶ 65. As

27  explained below, that ordinary meaning applies here. Conversely, Sony's

28

---

[1] The Parties proposed constructions for each term can be found in Appendix A.

constructions are so general that they interject confusion into the terms. In particular, Sony's constructions fail to address the differences between 2D and 3D graphics or how processing differs between these types of graphical images.

3D graphics are graphical images produced by rendering 3D geometric objects. A computer monitor displays images in two dimensions. Hart at ¶ 15. It must do so, because a display screen is two-dimensional and can only display images in the $x$ (width) and $y$ (height) planes. Conventional computer monitors do not display a $z$ (depth) dimension of a graphical image. Like taking a photo of a real-world scene, 3D graphics processing creates a 2D image of a scene made up of 3D objects. Specifically, 3D graphics uses 3D geometric models of objects with $x$, $y$, and $z$ coordinates at discrete points. *Id.* Because objects in 3D graphics are 3-dimensional, the appearance of these objects varies depending upon the perspective from which they are viewed. A 3D graphics processor "renders" an image of a 3D scene filled with 3D geometric objects according to a particular viewing angle and distance, like the photo taken with a camera. *See id.* Techniques such as shading, texturing and lighting may be used to give 3D geometric objects a realistic appearance despite being displayed in only 2 dimensions on a display screen. *Id.*; *see also* Fuchs at ¶ 65. As part of the rendering process, the 3D graphics processor determines which portions of each 3D object are visible, the screen pixel(s) that the object occupies, and the color of every pixel in the image. *Id.*

The Patents use the term "3-dimensional graphics" consistent with this ordinary meaning and specifically highlighting the rendering process. The specifications explain that computer images are generated through a series of steps, which include modeling, animation and rendering, with rendering being "the most difficult as it is the most processing intensive action." '238 at 1:31-38; *see also* Ex. 13 at 29 ("A great deal of processing power is needed for 3D rendering."). The Patents then note that graphic processing capabilities "are even further taxed in the display of 3-dimensional images," thereby necessitating specialized graphics

hardware to deliver 3D graphics images. '238 at 2:65-3:2. For these reasons, the Patents suggest that client devices use the resources of a remotely-located visual server to handle 3D graphics processing. *Id.* at 3:28-31. Consistent with the concept of capturing a photo of a 3D scene, the Patent Summary refers to 3-dimensional graphics as a "3D drawing":

> The present invention is an image display system and method of displaying images on a client through the use of the resources of a remote visual server. The Visual Server runs standard software, such as games, that are the same as versions running on standard personal computers. The Visual Server has certain support software modified to enable control of the application from the client and the delivery of the result of **3D drawing** to the client. One or more clients can access the visual server, or an array of servers, wherein each of the clients includes an image display.

*Id.* at 3:35-51; *see also id.* at 9:12-22; Ex. 7 at 3.

Nothing in the specification suggests that "3-dimensional graphics" should have a meaning other than its customary meaning. To the contrary, the use of "3D drawing," indicates that the term involves producing graphical images by rendering (or "drawing") 3D geometric objects for displaying on a 2D screen.

The prosecution history also is consistent with this ordinary meaning. One of the references cited during the prosecution of the '520 Patent was Deering (PCT/US00/15816). Ex 5 at IPL-FH-000372-411. Although the pending '520 application claims did not include any requirement related to "3-dimensional graphics," Deering's disclosure is instructive. Deering contrasts "simple 2D graphics data [that] may simply include color information for each pixel displayed" with 3D graphics data, noting that "3D graphics data may include x, y, z position information," as well as color and other information. *Id.* at -373. This reference from the intrinsic record highlights that a critical difference between 2D and 3D graphics

1    is the inclusion of 3-dimensional (or x, y, z) geometric information in 3D graphics.

2    Consistent with IPL's plain and ordinary meaning construction, the *IEEE*

3    *Dictionary*, the leading information technology dictionary developed by the IEEE

4    standards organization, defines "three-dimensional graphics" as follows:

5    **three-dimensional graphics:** The presentation of data on a two-

6    dimensional display surface so that it appears to represent a three-

7    dimensional model, and can be viewed from any position. *Note*: Each

8    coordinate of the model contains a triplet of information; for example *x*,

9    *y*, and *z* in the Cartesian coordinate system.

10   Ex. 10 at 1108. Other dictionaries are consistent with the *IEEE* definition. *See, e.g.*,

11   Ex. 11 at 579 (defining three-dimensional graphics (3-D) as "graphic images in three

12   dimensions—height, width, and depth. A three-dimensional image is rendered on a

13   two-dimensional medium; the third dimension, depth, is usually indicated by shading

14   or by means of perspective."); Ex. 12 at 519 ("three-dimensional model" defined as

15   "A computer simulation of a physical object in which length, width, and depth are

16   real attributes—a model, with *x*-, *y*-, and *z*- axes, that can be rotated for viewing from

17   different angles."); Ex. 13 at 29 ("3D animation presents objects and scenes in three-

18   dimensional space, rendered by computer technology. 3D animators use modeling

19   programs to create an environment of geometries and objects."). These computer

20   references indicate that in 3D graphics, the 3D geometry of objects is used during the

21   rendering process to develop an image that can be displayed on a 2D display screen.

22   Sony's construction does nothing more than simply rephrase the claim

23   language ("3-dimensional graphics" is "graphics in three dimensions"). This

24   construction provides little clarification regarding the meaning of this term. Chiefly,

25   it fails to convey the basic concept of what defines 3D graphics and how 3D graphics

26   are different than 2D graphics. The defining characteristic that distinguishes 3D

27   graphics from 2D graphics is that the graphical images are produced by rendering 3D

28   geometric objects. IPL's construction captures that concept, while Sony's does not.

In addition, Sony's proposed construction may interject confusion into this term. One could read Sony's construction to improperly suggest that 3-dimensional graphics requires ***displaying*** graphics in three dimensions rather than ***processing*** 3D geometric objects to produce pixel color values that are displayed on a 2D computer display. Such a construction would require a 3D display device, although there is absolutely no support in the record for such a requirement. The vagueness of Sony's construction could thus lead to jury confusion and should be rejected for that additional reason. Finally, the over broad nature of Sony's construction here becomes even more problematic when this term is considered in the context of the other "3-dimensional graphics" terms that focus specifically on processing.

### B.    3-dimensional graphics processing

The term "3-dimensional graphics processing" refers to the processing required to render 3D geometric objects in a computer system. As the Patents acknowledge, rendering a computer-generated image is the most computer-intensive step in graphics processing, especially when 3D graphical objects are involved. '238 at 1:31-38, 2:65-66; Hart at ¶ 17. In the case of 3D graphics, the rendering step requires the graphics processor to translate a mathematical representation of an entire 3D scene into a 2D image of that scene from a single selected viewpoint. *Id.* The scene to be rendered is effectively "painted" by combining spatial, textural, and lighting information for each 3D geometric object to determine the color value of each pixel in the final 2D image corresponding to the selected viewpoint. *Id.* IPL's construction captures this understanding of 3D graphics processing and is consistent with both the intrinsic and extrinsic evidence.

3D graphics processing requires specialized graphics processing hardware to perform this processing efficiently, given the complexity associated with rendering 3D graphics. *See, e.g.*, '238 at 1:31-38, 2:65-3:12. In the Patents, this processing hardware is provided at the server, and it is used to generate an image of a 3D scene. '093 claim 1; '238 at 7:19-25 ("image processor generates a modified image") and

Figure 1; Hart at ¶ 18. In one embodiment, the application running on the Visual Server sends drawing commands to an industry standard application programming interface (API), such as Direct3D or OpenGL, and these API's perform a 3D drawing that results in a 2D image using the 3D graphics processor capabilities at the server. '238 at 9:8-22 and Figure 3; Hart at ¶ 18. That image is compressed and transmitted to the client. '238 at 2:20-32; Hart at ¶ 18.

Rather than focusing on what it means to perform 3D graphics processing, Sony focuses on particular hardware that performs the claimed processing. Sony's construction requires a "3D graphics renderer," although the Patents never mention such a device. Further, a "3D graphics renderer" is not a commonly used industry term, and thus, its meaning is at best uncertain. The additional statement in Sony's proposed construction ("or otherwise processes graphics in three dimensions") is closer to the mark, but it also suffers from being vague since it is not clear what aspect of the graphics is being processed in three dimensions. *See* App. at 1. Specifically, it fails to capture the concept of rendering 3D geometric objects that is at the core of 3D graphics processing and the portion of the processing operation highlighted in the Patents.

The only mention of a "3D graphics renderer" comes not from the Patents, but instead from a reference, U.S. Patent No. 6,603,470 to Deering, cited during the '093 prosecution. According to Sony, statements made during the '093 Patent prosecution relative to the Deering '470 patent amount to a disclaimer to the effect that 3D graphics processing must "use a 3d graphics renderer." Sony's interpretation of the file history is both logically and legally flawed. The patentee's response described Deering's failure to teach the absence of 3D graphics processing ***on the client***, and thus did not involve any characterization, much less clear and unmistakable disclaimer, of what is required to show 3D graphics processing. *See* Ex. 6 at IPL-FH-000803.

For prosecution disclaimer to arise, the allegedly disavowing statements made

1 during prosecution "must be both clear and unmistakable." *3M Innovative Props. Co.*
2 *v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013); *Omega Eng'g, Inc. v.*
3 *Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003). Sony bears the burden of
4 proving that such a disclaimer exists. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056,
5 1063–64 (Fed. Cir. 2016). If the alleged disavowal is ambiguous or amenable to
6 multiple reasonable interpretations, there is no disclaimer. *Avid Tech., Inc. v.*
7 *Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (quoting *Cordis Corp. v.*
8 *Medtronic AVE, Inc*., 339 F.3d 1352, 1359 (Fed. Cir. 2003)). Review of the '093
9 prosecution history shows there was no such unmistakable disclaimer.
10      The August 15, 2013 Response in the '093 prosecution notes that the Examiner
11 had rejected certain claims as obvious based upon the combination of Yamada and
12 Deering. Ex. 6 at -801, -812. The Examiner conceded that the primary Yamada
13 reference did not disclose "the idea of using 3-dimensional graphics information
14 between a server and a client; and wherein said client device does not perform 3-
15 dimensional graphics processing on said at least one decompressed image." *Id.* at -
16 801. Therefore, the issue was whether Deering disclosed performing 3D graphics
17 processing at the server rather than at the client. *Id.* at -812-13. The patentee argued
18 Deering failed to disclose this feature—and in fact taught against it—because the
19 client device in Deering performed the 3D graphics processing. *Id.* at -801-03.
20      To support its argument, the patentee quoted Deering describing where 3D
21 graphics processing occurred, including the following:
22      "Decompression reverses this process. The ***decompressed stream of***
23      ***triangle data may then be passed to a traditional rendering pipeline,***
24      ***where it can be processed in full floating point accuracy***, and thereafter
25      displayed or otherwise used. (Deering, col. 3 lines 47-50)."
26 *Id.* at -802-03 (emphasis added). This passage indicates that the server delivers
27 "triangle data" (*i.e.*, 3D geometric data) to the client device, leaving it to the client
28 device to perform the full rendering process in "a traditional rendering pipeline" to

1    convert the 3D triangle data to a 2D image for displaying on a display screen.

2    Deering's Figure 1 (reproduced below) discloses that the client decoder 40

3    includes a "3-D Graphics Decompress 130" as well as a "3-D Graphics Renderer

4    140," which together perform the decompression and 3D graphics rendering

5    described in this passage. *See id.* at -803. Thus, the patentee's reference to the "3-D

6    Graphics Renderer 140" was simply showing that Deering expressly disclosed that

7    3D graphics processing occurred on the client in contravention to the claim language.



FIG. 1

*Id.* at -802.

From this Response, Sony incorrectly seeks to equate 3D graphics processing with a 3D graphics renderer. The Patent claims are focused on the processing, not on any particular hardware that performs that operation. Sony misses the thrust of the distinction made during prosecution, which was on the type of ***processing*** that was occurring and ***where that processing was occurring***. The passages quoted from Deering show that the rendering of 3D geometric data was done at the client device. In the Patent claims, 3D graphics processing occurs at the server. To the extent this prosecution history is relevant, it supports IPL's construction, not Sony's. It certainly doesn't rise to the level of a clear and unmistakable disavowal of subject matter beyond what the claim itself recites.

The only reason a 3D graphics renderer is mentioned at all is because that was

the specific device disclosed in Deering, not because there was an intent to distinguish any particular hardware or software. The patentee simply noted that the inclusion of a 3D graphics renderer on Deering's client showed that is where 3D graphics processing occurred. This statement cannot logically be construed as a concession that a 3D graphics renderer is required for 3D graphics processing.

Compounding the problem with Sony's construction is that "3D graphics renderer" is not a conventional term, and thus its meaning is unclear. In addition, Sony fails to address the processing requirement or the meaning of 3D graphics processing, and thus it only serves to interject ambiguity.

## C.   Does not perform 3-dimensional graphics processing

Consistent with its construction of "3-dimensional graphics" and "3-dimensional graphics processing," IPL construes "does not perform 3-dimensional graphics processing" by focusing on the particular type of processing that is encompassed by this restriction—the rendering of 3D geometric objects. Consequently, IPL proposes that the Court construe this term as "does not perform the graphics processing necessary to render 3D geometric objects." *See* App. at 1.

The claim language specifically requires that: (i) the server generates 3D graphics based on user input control signals; (ii) the client receives from the server 3D graphics in the form of a compressed stream of images; (iii) the client decompresses the stream of images and displays at least one image corresponding to the graphics; and (iv) the client device does not perform 3D graphics processing on the decompressed image. '093 claim 1. The claim is quite specific that the generation of the 3D graphics occurs at the server and a compressed stream of images is sent to the client device. It is equally specific about the processing not performed by the client device—***3-dimensional graphics processing on the at least one decompressed image***. The '238 claims are similar in that they also specify that the client device does not perform 3D graphics processing, but the claims all differ relative to the specific graphics or image on which 3D graphics processing is not performed. *Compare* '238

claim 1 ("does not perform 3-dimensional graphics processing **on said 3-dimensional graphics**") with '238 claim 6 ("does not perform 3-dimensional graphics processing **on the at least one image portion**") and '238 claim 15 ("does not perform 3-dimensional graphics processing") (emphasis added).

There are several items worth noting about this claim context. First, the processing that is precluded in the '093 and '238 claims is "3-dimensional graphics processing." The claims do not restrict other types of processing that may occur at the client device other than 3D graphics processing. Thus, for example, the claims do not preclude 2D graphics operations at the client device, nor do they preclude the storage of a graphical image that has already been rendered by the server from 3D geometric objects, nor any other operation not involving 3D graphics processing. Thus, if a further operation is performed at the client device that is not **rendering 3D geometric objects**, such an operation is not excluded from the claims.

Second, the claims are specific regarding the specific graphics information for which the client does not perform 3D graphics processing. According to the claim context, the prohibition on 3D graphics processing is limited to "said at least one decompressed image" ('093 claim 1); "said 3-dimensional graphics" ('238 claim 1); "the at least one image portion" ('238 claim 6); and "the compressed modified image" ('238 claim 15).[2] Graphics processing, including 3D graphics processing, on other graphical images is not excluded.

Having broadly tied "3-dimensional graphic processing" to a 3D graphics renderer, Sony seeks to use the "does not perform 3-dimensional graphics processing" term to completely preclude the use of such hardware at a client device, regardless of the type of processing that hardware performs. This prohibition on any use of a 3D graphics renderer far exceeds the restrictions recited in the claims, which are very specific to 3D graphics processing and to specific graphical elements.

---

[2] Unlike other claims, '238 claim 15 does not explicitly identify what graphics element relates to the "does not perform . . ." requirement. The claim context, however, logically indicates the limitation refers to the compressed modified image after it is decompressed.

Sony's position ignores the simple fact that a graphics processor is a processing element that is capable of processing various types of data, not just three-dimensional graphics data. As a very simple example, a 3D graphics processor is capable of also processing 2D graphics. It is also capable of more general types of processing operations not limited to graphics processing at all. Sony's construction seeks to exempt from coverage any use of a 3D graphics renderer, even if it is being used for something other than 3D processing. Such a construction is plainly inconsistent with the language of the claim itself.

The claims do not restrict all processing operations at the client, nor do they restrict graphics processing hardware at the client. Hart at ¶ 20. In fact, the specification indicates that some clients may include separate 3D components to assist in processing images. '238 at 3:13-19 ("[s]ome clients use separate 3D hardware component to assist in processing the images"), 3:13-14. In addition, the claims specifically recite that the client device performs decompression of the compressed stream of images. *See id.* claim 1. Under Sony's construction, if this decompression at the client were to occur in a 3D graphics renderer, it would be excluded from the claims because the client would "use a 3D graphics renderer." That is plainly wrong, because only 3D graphics processing is excluded by the claims, which involves the graphics processing necessary to render 3D geometric objects. Because decompression is performed on the 2D images resulting from the rendering of the 3D geometric objects, that decompression operation is not precluded and, in fact, is specified by the claim itself.

### D.   Transmitting a link to identify the client device

IPL's proposed construction clarifies the role of the claimed "link" in IPL's Patents. A link is more than a hyperlink, which is the only type of link Dr. Fuchs identifies. *See* Fuchs at ¶ 78. Instead, a link is something that relates together two things or situations. In the context of the Patents, a link establishes a relationship between the client and the server by providing information about the client device to

1   the server system. Specifically, claim 1 of the '826 Patent requires "transmitting a

2   link *to identify the client device to the server system* prior to transmitting the image-

3   modifying data." Thus, the server system uses the link to identify the client device.

4   The transmitted "link" is information that establishes this client-server relationship.

5          The specification provides an example of a link as a flag, transmitted from the

6   client to the server as part of a communication exchange. *See* '238 at 4:26-31 ("[T]he

7   method alternately further includes the step of transmitting a link or other flag to the

8   visual server from the client . . . ."); *id.* at 7:43-45 ("The link can be a flag at the

9   beginning of a frame or packet, or can be separate from the frame or packet."). The

10  use of a "flag" as the disclosed example indicates that a "link" covers the transmission

11  of information, and is not limited to only an address or a URL.

12         The server system uses the received link to identify the client device before the

13  client device transmits image-modifying data. *See id.* at 7:40-43 ("The thread

14  preferably begins with the step of sending a link to the visual server, step 50, which

15  indicates that the client 16, 18, 20 is about to send image-modifying data to the visual

16  server."). The server then uses the client identification to allocate image processing

17  resources at the server for use by a client. As the specification explains, after

18  receiving the link, the server "can make any necessary resource allocations for use in

19  the image-modification process." *Id.* at 7:45-48. Further, in instances where the

20  server has sufficient processing capabilities, the client need not transmit a link prior

21  to transmitting image-modifying data. *Id.* at 7:48-51. This demonstrates that the

22  server uses the link transmitted by the client to allocate resources.

23         This term should be construed to clarify that the claimed "link" is information

24  that performs the function of signaling a specific client's need for resources in IPL's

25  claimed system. A lay juror may hear the word "link" and associate it with a

26  hyperlink or URL, as Dr. Fuchs has done in his declaration. *See* Fuchs at ¶ 78. But

27  that is not how the term is used in the Patents. *See O2 Micro Int'l Ltd. v. Beyond*

28  *Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("[I]n many cases, the

meaning of a claim term as understood by persons of skill in the art is not readily apparent."). A link is information transmitted by the client device to the server which the server uses to identify the client device and to allocate server resources accordingly to the client's requirements. The term should be construed pursuant to IPL's proposal to prevent Sony from improperly asserting at trial that a "link" is a specific type of link not even recited in the intrinsic evidence.

### E.   Image-modifying data

The term "image-modifying data" appears in the '520, '826, and '238 claims. IPL's construction is straightforward and reflects the operation described in the Patents, that "image modifying data" broadly refers to input data generated at the client device used to create a modified image. Fundamentally, the ability of the client to generate and transmit image-modifying data to the server is what enables the client to interact with and control the application running on the server. *See* '238 at 3:35-51 (client is able to "control the application running on the server), 4:60-66 ("the client can interactively generate complex graphical images").

Turning first to the claims, the language is clear. For example, '520 claim 1 specifies that: (i) the client generates image-modifying data; (ii) corresponding to a generated image; (iii) that is transmitted to the server; (iv) the server generates a modified image "based upon the image modifying data"; and (v) compresses and transmits the modified image back to the client. *See also* '826 claim 1; '238 claim 1.

The specification is consistent with the claim language. For example, the Summary provides:

> The system includes a visual server having image data processing capabilities wherein the server selectively receives ***image-modifying data*** from one or more clients ***corresponding to a generated image***, and the server generates ***a modified image based upon the image-modifying data***, and then transmits the modified image as compressed data back to the client.

IPL'S OPENING CLAIM CONSTRUCTION BRIEF

'238 at 3:35-51 (emphasis added); *see also* 3:52-61. The specification explains that client devices generate "image-modifying data . . . corresponding to a generated image" on the client display. The client transmits the image-modifying data to the server, which creates a modified image "based [upon that] image-modifying data."

Similarly, the Detailed Description correlates the image-modifying data to an image "generated by a game being played on the client":

> In operation of the image display system 10, the visual server 12 selectively receives ***image-modifying data*** from the client 16,18,20 ***corresponding to a generated image***, such as that ***generated by a game*** being played on the client, or a multimedia application being executed on the client. The visual server 12 then generates a ***modified image based upon the image-modifying data***, compresses the image or image data with a specific "codec" (compression/decompression) algorithm, and transmits the modified image as compressed data back to the client 16,18,20.

*Id.* at 6:23-32 (emphasis added); *see also* 7:19-36. Thus, the specification makes it apparent that ***the game*** generates the image and will modify that image based on the inputs received during the playing of the game at the client.

Despite the clarity of the claims and the specification, Sony takes the position that the meaning of "image-modifying data" was altered during prosecution and must be construed to effectively require generation of a modified image ***solely from*** the image-modifying data received from the client, without the ability to make ***any*** decisions. Sony's proposal cannot be squared with the specification and claims that require an interactive game application to run on the server and to generate the images. *See, e.g.*, *id.* claim 1; 6:23-32. In any such interactive game, the application running on the server will necessarily be responsible for making certain decisions regarding the manner in which the images will be modified.

For example, the data provided by the client in a game application reflects the

state of the buttons and/or the position of a joystick controller. This data is interpreted in the context of the game application executing on the server. The data may indicate a player has changed its position or its direction of view, or it may indicate a particular action such as activating a weapon or turning a steering wheel. The game application receives this data from the client and creates a new image based upon that input, but the game application necessarily will make decisions regarding the result of a particular input, including whether the particular client action is permitted. For example, a player may be precluded from walking or driving through a wall or barrier, or the game application may make a decision whether a shot hits a moving target based upon the game algorithm. The server does not make any decision regarding whether the button was pressed or whether the joystick was moved, but it does decide how the image must be modified in response to that input within the context of the game application. *See id.* at 3:39-41 ("The Visual Server has certain support software ***modified to enable control of the application*** from the client.") (emphasis added).

Sony's overly broad disclaimer is an attempt to remove every game application from the scope of the claims and goes far beyond any statements made during prosecution. The patentee never argued or suggested that "image-modifying data" should be construed to eliminate the ability to update the state of a game application running on a server, but that is effectively the disclaimer that Sony seeks. Sony focuses unduly on certain snippets from the prosecution history while ignoring the underlying context within which those statements were made. For prosecution disclaimer to arise, Sony must establish that the allegedly disavowing statements made during prosecution are "both clear and unmistakable." *Trivascular,* 812 F.3d at 1063–64; *Omega Eng'g,* 334 F.3d at 1326. Where, as here, the alleged disavowal is amenable to multiple reasonable interpretations, there is no disclaimer. *Avid Tech.,* 812 F.3d at 1045; *Cordis,* 339 F.3d at 1359.

There are three fundamental points that permeate the extensive '520

17

prosecution history. First, image-modifying data was repeatedly noted to be fundamentally different than information that merely identified "an intended use" of data. As an example, sending information identifying that a document was going to be printed on a specific printer was different than client data—such as that generated during the playing of a video game—that instructed the server how to modify an image. Second, sending information instructing a server to format data is not image-modifying data. Third, image-modifying data is data that is used by the server to create content, reflecting a modification to an existing image. All the statements made during prosecution reflect an attempt to convey these basic concepts, not to restricting the playing of an interactive game according to its normal operation.

During the '520 prosecution, the Examiner rejected the pending claims based on Khan and Lee. Ex. 5 at IPL-FH-000333, -272-73. Relative to Khan, which disclosed collecting content from the Internet and converting it into a format suitable for a particular device, the patentee argued that reformatting image content did not satisfy the claim requirement of generating a modified image based upon image-modifying data. *Id.* at -310-13. According to the patentee, "the present application is intended to create content, while the Khan reference is limited to the formatting of existing content." *Id.* at -312. After this Response, the Examiner withdrew the Khan rejection. *Id.* at -272. The fundamental distinction was that Khan simply collected and reformatted images; it did not use image-modifying data to create content.

The exchanges regarding Lee were far more extensive and spanned several years. Lee disclosed a system in which a client identified an "intended use" of data to the server, and the server then optimized the data for the specified intended use. *Id.* at -218 ("11/10/06 Response"). Because the phrase "intended use of data" was ambiguous, the patentee referred to examples in Lee to explain the type of information encompassed by that concept. *Id.* at -218-19. For example, the client in Lee may transmit information to identify an Inkjet printer to be used to print data together with the desired resolution, and in response "the server program may tune

the data for printing instead of viewing and will tune it to the characteristics of the Inkjet printer." *Id* at -219. The patentee argued that because Lee "merely sends information about intended use of the data, [i]t does not send information instructing the server how to modify the data, and therefore does not send 'image modifying data,' as claimed." *Id.* at -219. Sony cites to subsequent passages in this Response, but it ignores the underlying context. Ultimately, the Examiner was unpersuaded by the statements advanced by the patentee. *Id.* at -202.

Subsequent to this response, there were many other exchanges between the Examiner and the patentee regarding Lee that echo these same concepts. One such exchange highlighted by Sony occurred in response to a later Office Action:

> [I]n Lee, the client sets the objective, and the server determines the details of how to achieve this objective. The client application in Lee is not involved in the decision making.

> Contrastingly, the server in the current application is not allowed to make a decision. It must follow the selected instructions sent by the client and contained in "image-modifying data" . . . .

*Id.* at -091 ("4/18/08 Response"). The distinction drawn in this passage (as well as other similar exchanges) is that the client is providing instructions that the server must use to determine a modified image. That is the nature of game inputs provided by a player. The game application cannot simply ignore those inputs. The statement is not meant to broadly say that the server cannot make any other determinations required by the game application or that the server cannot execute the rules and constraints specified in the application. Instead, it is drawing a distinction between the disclosure of Lee on the one hand in which the client had no say in how an objective is achieved, and the '520 application on the other in which the server determines changes to the next image based on the client inputs provided in the context of the application running on the server.

This distinction is highlighted throughout the '520 prosecution history. In the 11/10/06 Response discussed previously, the patentee contrasted Lee's disclosure

that "'the server makes choices about how the data will be optimized for its intended
use in the client application'" with claim 1 in which "the information which the client
sends (*i.e.*, the 'image-modifying data') itself instructs the server how to modify an
image." *Id.* at -219. In the 4/18/08 Response, the patentee distinguished Lee because
"the intended use of data" only changed the ***format of the data***, and ***not the visual
content***. *Id.* at -089 (emphasis added). In contrast, in the '520 application "[t]he client
selects the data necessary for the server to generate an image with modified elements
i.e. ***the visual image changes***." *Id.* at -091 (emphasis added). "The modification
necessarily changes image context or information, ***modifying more than the
formatting of the data and changing the visual image***." *Id.* (emphasis added). The
'520 prosecution statements are subject to multiple reasonable interpretations, and
thus there is no disclaimer under the law. *Avid*, 812 F.3d at 1045.

The clearest statement regarding the interpretation of "image-modifying data"
is the passage in which the patentee specifically highlighted the definition of "image-
modifying" data. The patentee indicated that "the term 'image modifying data' has
been defined in the present application," as shown by this passage from the Summary:

The clients [sic] are in selective communication with the visual server,
and each client selectively generates image-modifying data
corresponding to the image resident on the image display of that specific
client. The client selectively transmits the image-modifying data to the
visual server, and the client then receives . . . .

*Id.* at -194 (04/19/07 Response).

The patentee thus directed the Examiner back to the patent specification for an
understanding of "image-modifying data"—the exact same passage on which IPL
relies for its construction. In contrast to the '520 specification, the patentee noted that
"Lee is concerned with proper formatting and use of data on a client computer." *Id.*
at -194. Rather than teaching "image-modifying data," Lee instead "optimizes data
for a particular client use." *Id.* at -194-95; -149-50 (in contrast to Lee, "image-

modifying data" "instruct[s] the server [to] generate a modified image based on an image, changing the context or information contained in the image" whereas Lee only modifies the format). Once again, the Examiner refused to accept the arguments advanced by the patentee, maintaining (as he did throughout the '520 prosecution) that Lee's transmission of the "intended use" of data met the image-modifying data limitation. *Id.* at -176-77. It was not until the claims were ultimately amended to add the final wherein clause that the '520 claims were allowed. *Id.* at -032-34.

The '520 prosecution history was a lengthy, involved affair. Sony asks the Court to take snippets of the exchanges and to craft a disclaimer from those specific passages, while ignoring the context of those discussions and the basic distinction between the system in Lee the claimed invention. When the entirety of the prosecution is considered within the context of the Lee reference, it is clear Sony is overreaching in the disclaimer it seeks. And ultimately, the Examiner disagreed with the distinctions and found that Lee met the image-modifying data limitation, after years of debate between the Patent Office and the patentee.

## F.    Complex interactive games

Indefiniteness must be proven by clear and convincing evidence. *Cox Comm., Inc. v. Sprint Comm. Co.*, 838 F.3d 1224, 1228 (Fed. Cir. 2016). To be definite, a patent must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S 898, 910 (2014). "Absolute precision is unattainable" in patent claims. *Id*. Sony appears to focus its challenge on the word "complex." *See* Fuchs at ¶¶ 22-27. Whether construed according to IPL's construction or according to the ordinary meaning of "complex," the claims are not indefinite.

One of the goals of the Patents is to allow a client to run 3D game applications that exceed the ability of the client to run them locally because of their computational complexity. '238 at 2:65-3:31. As explained in both the specification and Dr. Hart's declaration, there are significant differences in the processing required to render 2D

and 3D graphics—3D graphics processing is inherently more complex. Hart at ¶¶ 22-23. The specification explains that 3D processing was not available on basic client devices prior to IPL's invention because of the computational complexity required. '238 at 2:65-3:2 ("Client graphic image display processing capabilities are even further taxed in the display of 3-dimensional images."); *id*. at 3:20-27 ("[F]or reasons of cost, size, and power consumption, sophisticated three dimensional graphics are not available on common consumer client devices . . . ."). In contrast to the absence of suitable 3D graphics processing capabilities, the specification presupposes that the client device will be able to handle certain less complicated 2D graphics operations, such as the decompression and display of the 2D image produced by the rendering of 3D geometric data by the server. *See id.* at 6:42-56.

IPL's Patents uniformly use the word "complex" to mean 3D graphics. The Abstract teaches that a client device can display "complex 3-dimensional graphics." The stated purpose of the invention is to "display complex three dimensional graphics, such as those used by games, on these consumer client devices." *Id.* at 3:25-27; *see also* 9:1-3, 9:33-35. One of the advantages of the system is "that the client can interactively generate complex graphical images to a user without the need for significant client resources." *Id.* at 4:60-63. The specification teaches that the server handles "complex visual processing" for the client. *Id.* at 9:9-13. The provisional application uses "complex" in a similar manner. Ex. 7 at 3 (discussing "a need to display complex three dimensional graphics, specifically those used on games"); *id.* (Visual Server "handles all complex visual processing"); *id.* (one advantage of the invention is "the ability to display complex 3D graphics on a device lacking necessary hardware"); *see* Ex. 5 at -373 (Deering contrasting "high performance graphics systems that can render ***complex*** three-dimensional (3D) objects" with "***simple*** 2D graphics data" (emphasis added)).

The Patents use "complex" to distinguish between 2D and 3D processing, not to distinguish between "simple" 3D graphics and "complex" 3D graphics. Dr. Fuchs

opines that the specification "does not provide any examples of what types of 3D graphics are complex and what types of 3D graphics are not complex." Fuchs at ¶ 25. This is a straw man argument—the Patents do not attempt to distinguish between simple and complex 3D graphics processing, nor does IPL contend they do. Instead, every citation uses the word "complex" to emphasize it is referring to 3D processing, not 2D processing. Dr. Fuchs does not cite any intrinsic evidence where the patentee attempts to distinguish between simple and complex 3D graphics.

A skilled artisan can easily distinguish between a 2D and a 3D interactive game, as Dr. Fuchs' declaration illustrates. Dr. Fuchs identifies one game using 2D graphics and a second game using 3D graphics, with no apparent trouble distinguishing between the two. Fuchs at ¶¶ 32-33. Dr. Fuchs cites the games to argue 2D graphics can be *visually* complex, but his argument distorts the issue. As the specification explains, there is a significant difference between *processing* 2D and 3D graphics. '238 at 3:20-27. "Complex" interactive games refers to the complexity of the graphics processing operations, not the complexity of the resulting image display. *See supra* regarding "3D graphics" and "3D graphics processing."

## G.    Acceptable frame rate

Claim 14 of the '238 Patent contains a negative limitation—the client device lacks sufficient processing power to run a client-device-only version of a "game application" and display graphics corresponding to the application "at an acceptable frame rate." Claim 6, from which 14 depends, requires "complex interactive games" to be displayed at the client device in real-time. Thus, an "acceptable frame rate" is one that exists within the context of a complex interactive game being displayed at a client device in real-time.

As the specification explains, the server transmits to the client device a "modified image" that is "compressed data comprising a frame." *Id.* at 4:42-46. If the bandwidth of the system is sufficient ("approaching real-time speeds"), the server can transmit enough image data to the client to allow the client to display multimedia

applications "such as games and other graphic-intensive applications." *Id*. at 6:17-
22. The Abstract describes this as providing "a sequential display of modified frames
on client to support animation with complex 3-dimensional graphics." *Id.* at Abstract.

The "frame rate" is the number of frames a system can produce and display in
one second. Hart at ¶ 25. A skilled artisan would understand an acceptable frame rate
for a complex interactive game is a rate that conveys smooth motion. *See id*. at ¶ 26
("In the 2000 time period, a frame rate was considered acceptable if it generally
conveyed smooth motion to the user."). Dr. Hart cites a leading textbook that teaches
"a sequence of frames displayed on a screen at more than 15 frames per second can
convey smooth motion or changing form . . . ." *Id.* (citing Ex. 14 at 3). Dr. Hart also
cites "A Beginner's Guide to Frame Rates," which similarly teaches that "our brains
can make a continuous moving picture with as little as 16 [frames per second]." *Id.*
(citing Ex. 15). To the computer graphics industry, more than 15 frames per second
is sufficient to convey smooth motion. *Id.* Importantly, Sony's expert (Dr. Fuchs)
does not dispute that a skilled artisan would be able to determine whether a frame
rate conveyed smooth motion, nor does he dispute that a frame rate of greater than
15 frames per second will convey smooth motion. *See* Fuchs at ¶¶ 36-43.

Instead, Dr. Fuchs opines that "acceptable frame rate" is indefinite because
different frames rates may be required for different applications. But a claim term
may be subject to terms of degree and still be definite. *See Guangdong Alison Hi-
Tech Co. v. ITC*, 936 F.3d 1353, 1362 (Fed. Cir. 2019) (noting that defendant "seeks
a level of numerical precision beyond that required when using a term of degree").
The Federal Circuit has repeatedly upheld claims that lack mathematical certainty.
*See Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1291 (Fed. Cir. 2017)
(collecting cases). What Dr. Fuchs conveniently ignores is that the claims specify the
application context; the asserted claims are limited to complex interactive games. A
skilled artisan could readily determine an acceptable frame rate for complex
interactive games. *See One-E-Way, Inc. v. ITC*, 859 F.3d 1059, 1063 (Fed. Cir. 2017)

("To determine whether a particular term is indefinite, one must bear in mind that patents are not addressed to lawyers, or even to the public generally, but rather to those skilled in the relevant art." (alterations omitted)).

Further, Dr. Fuchs' own writings demonstrate that smooth motion was well understood to skilled artisans. In one of Dr. Fuchs' papers describing rendering, he states that "the resulting image sequences give the impression of *moving continuously, with a rough approximation of motion blur*, rather than jerking between discrete positions." Ex. 16 at 1 (emphasis added). He later describes a particular display as exhibiting "fluid motion" and explicitly distinguished between "jerky motion" and "fluid motion." *Id.* at 1-2. These statements show that not only can skilled artisans such as Dr. Fuchs determine whether a display conveys smooth motion, but also that Dr. Fuchs has done so in academic publications. Similarly, Dr. Fuchs' papers demonstrate a skilled artisan would understand the frame rate necessary for interactive applications. Dr. Fuchs opines that "[t]here was no industry standard in 2001 and there is no such standard today that could be used to determine whether a frame rate is acceptable." Fuchs at ¶ 38. But Dr. Fuchs' writings tell a different story. Dr. Fuchs published a paper explaining that "[o]ne of the long-term goals of computer graphics has been, and continues to be, the rapid, possibly real-time generation of realistic images of simulated 3-D environments. 'Real-time,' in current practice, has come to mean *creating an image in 1/30 of a second*—fast enough to continually generate images on a video monitor." Ex. 17 at 1 (emphasis added). Another paper by Dr. Fuchs described a rendering algorithm "that generates shaded display of objects with hundreds of polygons *rapidly enough for interactive use* . . . ." Ex. 18 at 1 (emphasis added). Skilled artisans are capable of determining the frame rate acceptable for interactive applications.

## IV. Conclusion

For the above reasons, the Court should adopt IPL's proposed constructions.

Dated:  March 23, 2020

By:  */s/ Kalpana Srinivasan*
Kalpana Srinivasan
Krysta Kauble Pachman
Jesse-Justin Cuevas
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, 14th Floor
Los Angeles, CA 90067
ksrinivasan@susmangodfrey.com
kpachman@susmangodfrey.com
jcuevas@susmangodfrey.com
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Max L. Tribble, Jr.
David Peterson
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002
mtribble@susmangodfrey.com
dpeterson@susmangodfrey.com
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Michael F. Heim
Eric Enger
Blaine Larson
William B. Collier, Jr.
**HEIM, PAYNE & CHORUSH, LLP**
1111 Bagby St., Suite 2100
Houston, Texas 77002
mheim@hpcllp.com
eenger@hpcllp.com
blarson@hpcllp.com
wcollier@hpcllp.com
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Attorneys for Plaintiff Intellectual Pixels Limited

# APPENDIX

**A.    3-dimensional graphics**

| Claim Term | IPL'S Construction | Sony's Construction |
|---|---|---|
| **3-dimensional graphics**<br><br>'093 claim 1<br>'238 claims 1, 6, 15 | graphical images produced by rendering 3D geometric objects | graphics in three dimensions |

**B.    dimensional graphics processing**

| Claim Term | IPL'S Construction | Sony's Construction |
|---|---|---|
| **3-dimensional graphics processing**<br><br>'093 claim 1<br>'238 claims 1, 6, 15 | graphics processing necessary to render 3D geometric objects | uses a 3D graphics renderer, or otherwise processes graphics in three dimensions |

**C.    Does not perform 3-dimensional graphics processing**

| Claim Term | IPL'S Construction | Sony's Construction |
|---|---|---|
| **does not perform 3-dimensional graphics processing**<br><br>'093 claim 1<br>'238 claims 1, 6, 15 | does not perform the graphics processing necessary to render 3D geometric objects | does not use a 3D graphics renderer, or otherwise process graphics in three dimensions |

**D.    Transmitting a link to identify the client device**

| Claim Term | IPL'S Construction | Sony's Construction |
|---|---|---|
| **transmitting a link to identify the client device**<br><br>'826 claim 1 | Transmitting information to identify a client device | Plain meaning |

**E.    Image-modifying data**

| Claim Term | IPL'S Construction | Sony's Construction |
|---|---|---|
| **image-modifying data**<br>'520 claims 1, 6, 7<br>'826 claim 1<br>'238 claims 1, 6, 15 | input data used to create a modified image | data that directly instructs the server how the image should be modified, such that the server makes no decisions about how the image should be modified |

**F.    Complex interactive games**

| Claim Term | IPL'S Construction | Sony's Construction |
|---|---|---|
| **complex interactive games**<br><br>'238 claims 1, 6, 15 | games which produce 3D graphics in which a client device sends input signals and a stream of one or more 3D graphic images are generated in response | Indefinite under 35 U.S.C. § 112, ¶ 2. |

1

## G.    Acceptable frame rate

2

3

| Claim Term | IPL'S Construction | Sony's Construction |
|---|---|---|
| **acceptable frame rate**<br><br>'238 claims 14, 20 | at a rate that conveys smooth motion | Indefinite under 35 U.S.C. § 112, ¶ 2. |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IPL'S OPENING CLAIM CONSTRUCTION BRIEF

1

## **CERTIFICATE OF SERVICE**

2   I hereby certify that a copy of the foregoing document was served on all

3 attorneys of record via ECF on March 23, 2020.

4

5          */s/ Kalpana Srinivasan*

6          Kalpana Srinivasan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IPL'S OPENING CLAIM CONSTRUCTION BRIEF