**WILMER CUTLER PICKERING HALE AND DORR LLP**
Mark D. Flanagan (SBN 130303)
Mark.Flanagan@wilmerhale.com
Joseph F. Haag (SBN 248749)
Joseph.Haag@wilmerhale.com
S. Dennis Wang (SBN 261296)
Dennis.Wang@wilmerhale.com
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Fax: (650) 858-6100

James M. Dowd (SBN 259578)
James.Dowd@wilmerhale.com
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5393
Fax: (213) 443-5400

Attorneys for Defendant
*Sony Interactive Entertainment LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| INTELLECTUAL PIXELS LIMITED,<br><br>                              Plaintiff,<br><br>     v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC;<br><br>                              Defendant. | Case No. 8:19-cv-01432-JVS-KES<br><br>**SONY INTERACTIVE ENTERTAINMENT LLC'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br><u>Claim Construction Hearing:</u><br><br>Date:  April 20, 2020<br>Judge:  Hon. James. V. Selna |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................... 1

II.  DISPUTED CLAIM TERMS ....................................................................... 2

    A.   "image-modifying data" ................................................................ 2

    B.   "3-dimensional graphics processing" / "does not perform 3-dimensional graphics processing" .............................................. 10

    C.   "3-dimensional graphics" ........................................................... 13

    D.   "transmitting a link to identify the client device" ..................... 15

    E.   The terms "complex interactive games" and "acceptable frame rate" are indefinite under 35 U.S.C. § 112 ................................. 15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ............................................................. 9

*Aubin Indus. v. Caster Concepts, Inc.*,
    2015 WL 4284715 (E.D. Cal., Sept. 27, 2017) ................................................... 19

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017) ................................................................... 7, 12

*Becton Dickinson and Co. v. Tyco Healthcare Group LP*, 616 F.3d 1249
    (Fed. Cir. 2010) ....................................................................................................... 9

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,
    528 F. Supp. 2d 967 (N.D. Cal. 2007).............................................................. 14

*CAE Screenplates Inc. v. Heinrich Fieldler GmbH*,
    224 F.3d 1308 (Fed. Cir. 2000) ........................................................................ 9

*GE Lighting Sols., LLC v. Lights of Am. Inc.*,
    663 F. App'x 938 (Fed. Cir. 2016) (unpublished disposition)......... 16, 17, 18, 23

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ....................................................................... 13

*Halliburton Energy Servs. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) ................................................................... 17, 18

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed Cir. 2008) .......................................................................... 9

*In the Matter of Certain Wireless Standard Compliant Elec. Devices*,
    ITC Inv. No. 337-TA-953, 2015 WL 13310467 USITC Order No.
    29 (Oct. 23, 2015) (Markman Order)..................................................... 17, 22, 23

*Innovative Display Techs. LLC v. Acer Inc.*,
    2014 WL 4230037 (E.D. Tex. Aug. 26, 2014)............................................ 17, 19

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ................................................................*passim*

-ii-

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ............................................................... 2, 16

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
    403 F.3d 1364 (Fed. Cir. 2005) ................................................ 2

*Nexus Display Techs. LLC v. Dell Inc.*,
    2015 WL 5578735 (E.D. Tex. Sept. 22, 2015) ...................... 17, 19

*Omega Eng'g, Inc, v. Raytek Corp.*,
    334 F.3d 131424 (Fed. Cir. 2003) ....................... 1, 3, 7, 12

*Openwave Sys., Inc. v. Apple Inc.*,
    808 F.3d 509 (Fed. Cir. 2015) ................................................ 20

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
    457 F.3d 1284 (Fed. Cir. 2006) .......................................... 2, 24

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................ 1, 8, 20, 21

*ProconGPS, Inc. v. Skypatrol, LLC*,
    2012 WL 3276977 (N.D. Cal. Aug. 9, 2012) ...................... 14

*Rovi Guides, Inc. v. Comcast Corp.*,
    2017 WL 3447989 (S.D.N.Y. Aug. 10, 2017) ...................... 17, 19

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) .......................................... 7, 13

*Semcon IP Inc. v. Huawei Device USA Inc.*,
    2017 WL 2972193 (E.D. Tex. Jul. 12, 2017) ...................... 17, 19

*Signal IP v. Am. Honda Motor Co.*,
    2015 WL 5768344 (C.D. Cal. Apr. 17, 2015) ...................... 17, 19

*Tech. Props. Ltd. LLC v. Huawei Techs. Co.*,
    849 F.3d 1349 (Fed. Cir. 2017) .......................................... 21

*Va. Panel Corp. v. Mac Panel Co.*,
    133 F.3d 860 (Fed. Cir. 1997) .......................................... 15

-iii-

# STATUTES, RULES, AND REGULATIONS

35 U.S.C. § 112 .................................................................................. 2, 16, 24

Sony Interactive Entertainment LLC's Opening Claim Construction Brief
Case No. 8:19-cv-01432-JVS-KES

## I.    INTRODUCTION

The parties' competing constructions reflect fundamentally different approaches to claim construction.  Sony Interactive Entertainment LLC ("Sony") has proposed to construe terms consistent with the applicant's clear and unmistakable statements made during prosecution, following well-established Federal Circuit law.  Intellectual Pixels Limited ("IPL"), on the other hand, either ignores the applicant's disclaimers during prosecution or attempts to re-draft claims without any intrinsic support.

For example, in order to obtain the claims reciting "image-modifying data," the patentee convinced the Patent Office that "Applicant was acting as his own lexicographer" and that "image-modifying data" means that the data must "directly instruct" the server such that the server "is not allowed to make a decision" and "must follow the instructions sent by the client."  *See* Ex. 10 (Jan. 19, 2007 Final Rejection) at 3; Ex. 08 (Aug. 9, 2006 Amendment) at 11; Ex. 12 (Oct. 23, 2007 Amendment) at 19–20.  Consistent with this clear lexicography, Sony proposes construing this term to mean "data that directly instructs the server how the image should be modified, such that the server makes no decisions about how the image should be modified."

IPL, by contrast, ignores this prosecution history and seeks to broaden the term's meaning to cover any "input data used to create a modified image."  IPL's construction is thus at odds with what the patentee told the Patent Office to obtain its claims.  *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323–24 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.").

IPL's proposed construction of the term "transmitting a link" to mean "transmitting information" is equally at odds with basic claim construction principles. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the

patentee is entitled the right to exclude. . . .  [W]e look to the words of the claims themselves . . . to define the scope of the patented invention.") (internal quotations and citations omitted).  Nothing in the intrinsic record alters the ordinary meaning of the plain English term "link," yet IPL seeks to dramatically expand this term to cover all forms of "information."  There is no intrinsic record support for such a blatant attempt to stretch the claims.

Finally, the terms "complex interactive games" and "acceptable frame rate" are indefinite because they fail to provide reasonably certain notice of the meets-and-bounds of the claims as required by 35 U.S.C. § 112.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 898–99 (2014); *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371–74 (Fed. Cir. 2014).  As shown below, both are subjective terms of degree, and the intrinsic record lacks any objective boundaries for a person of ordinary skill in the art to determine whether a game is "complex" or not, or whether a frame rate is "acceptable" or not.  Indeed, IPL's attempt to save these claims from invalidity would read the words "complex" and "acceptable" out of the terms altogether—an approach the Federal Circuit squarely rejects.  *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006) ("we should not rewrite claims to preserve validity") (quoting *Nazomi Comm'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005)).

## II.     DISPUTED CLAIM TERMS

### A.     "image-modifying data"

| Claim Term | Sony's Construction | IPL's Construction |
|---|---|---|
| "image-modifying data" ('520 claims 1, 6, 7); ('238 claims 1, 6, 15); ('826, claim 1) | data that directly instructs the server how the image should be modified, such that the server makes no decisions about how the image should be modified | input data used to create a modified image |

### 1)    The term "image-modifying data" is subject to prosecution disclaimer

To gain allowance of the '520 patent, the patentee told the Patent Office that "Applicant is acting as his own lexicographer" in defining "image-modifying data," and repeatedly said what "image-modifying data" means in this patent.[1]  Sony's proposed construction gives effect to these clear and unmistakable statements.  IPL ignores them.

During prosecution, the Examiner initially rejected claim 1 of the '520 patent over U.S. Patent No. 6,658,167 to Lee ("Lee"), finding that Lee teaches "image-modifying data."  Ex. 07 (Oct. 5, 2005 Office Action) at 3–4.

In response, the applicant—in five separate responses—told the Examiner that "image-modifying data" means data that "directly instructs" the server how the image should be modified, such that the "server makes no decisions" about how the image should be modified.

*First*, on August 9, 2006, the applicant distinguished the claimed "image-modifying data" by stating "[i]n Lee, the server receives information from the client (e.g., print resolution) and *the server makes choices* about how the data will be optimized for its intended use in the client application."  Ex. 08 '520 File History (Aug. 9, 2006 Amendment) at 9–10.[2]  The applicant then clearly and unambiguously disclaimed from the scope of "image-modifying data" data sent by the client that (1) does not instruct the server how to modify the data and/or (2) permits the server to decide how to modify the image.  Specifically, the applicant stated "[h]ence, the client

---

[1] The '520 patent is the parent to the other patents-in-suit.  Thus, prosecution disclaimer in the '520 patent attaches to the construction of "image-modifying data" in the '826 and '238 patents as well.  *Omega Eng'g, Inc.*, 334 F.3d at 1333.

[2] Emphasis appearing in quotations has been added unless otherwise indicated.

of Lee merely sends information about intended use of the data.  ***It does not send
information instructing the server how to modify the data, and therefore does not
send 'image modifying data' as claimed.  The decision of how to modify the data is
made by the server of Lee***."  *Id.*

To further distinguish Lee over the claimed "image-modifying data," the
applicant stated that in the '520 claims, "the information which the client sends (*i.e.*,
the 'image-modifying data') itself instructs the server how to modify an image.  This
information ***replaces*** the choices made by Lee's server." *Id.* at 10.  The applicant
confirmed this disclaimer noting "in Lee, the server receives indirect information
about the use of data and itself decides how it should modify the data.  ***The decision
of how to modify the data, made by the server, depends on software residing on the
server.  The server makes these choices based on its own software.***" *Id.*

The applicant emphasized that the claimed image-modifying data "directly
instructs" how the image should be modified, resulting in no decisions made by the
server, by telling the Patent Office that "[i]n claim 1, the 'image-modifying data'
***directly instructs*** how the image should be modified.  ***The server of claim 1 need not
make such choices*** as the server of Lee is required to make." *Id.* at 11.  Further, the
applicant explained that "[t]his is because the information Lee's client sends is only
information about the intended use of data, and ***does not directly instruct the server
how to modify the data.  The server of Lee makes that decision, based on an
application residing in the server.  But in claim 1, the client itself instructs the
server how to modify the data.***" *Id.*  Accordingly, "the client of Lee doesn't send
image modifying data.  It only sends information about the use of some data, ***without
instructions of what actual modifications to make.  The server takes the information
on intended use and makes choices*** of how to modify the data." *Id.*

The applicant once again explained "[t]he client of Lee does not send 'image-
modifying data' as claimed [because it] only sends information about the use of the

-4-

data, without instructions of how to modify the data." *Id.* at 11–12.  In Lee, **"[t]he server modifies any data according to its own programming**, not according to image-modifying instructions from the client." *Id.*  Confirming that this disclaimer was made knowingly and intentionally, the applicant repeated its disclaimer for at least the fourth time in a single submission explaining that "[t]he same client in Lee could send its information about intended use to two different servers in Lee, and, depending on the configuration of each server, the client would receive back differently modified data, **depending on the choices made by either server**." *Id.*

**Second**, on November 6, 2006, after the Patent Office notified the applicant that its amendment was deficient, the applicant reiterated its arguments disclaiming image-modifying data.  The applicant argued again that "[t]he information sent from the client to the server in Lee does not instruct the server how to modify the image.  In Lee, another step is required—a step not required in the present claim 1, for example." Ex. 09, '520 File History (Nov. 06, 2006 Amendment) at 9.  The applicant noted that "[t]he **decision of how to modify the data is made by the server of Lee**." *Id.* at 9–10. According to the applicant, however, claim 1 is different because "the information which the client sends (i.e., 'the image-modifying data') itself instructs the server how to modify an image.  This information **replaces** the choices made by Lee's server." *Id.* at 11.  The applicant reiterated that "in Lee, the server received indirect information about <u>the use of data</u>, and itself decides <u>how it should modify the data</u>. The decision of how to modify the data, made by the server, depends on software residing on the server.  The **server makes these choices** based on its own software." *Id.* (underline emphasis in original).  In claim 1, by contrast, the applicant emphasized that "the **client itself instructs the server** how to modify the data.  In short, the client of Lee doesn't send image modifying data.  It only sends information about use of some data, without instructions of what actual modifications to make." *Id.*

***Third***¸ on April 19, 2007, the applicant emphasized it was acting as its own lexicographer with respect to image-modifying data.  In the Patent Office's final rejection on January 19, 2007, the Examiner explained, "Applicants argue that Lee does not instruct the server how to modify the image[,] . . . [i]n fact, it appears that Applicants are interpreting the claims very narrow[ly]."  Ex. 10, '520 File History (Jan. 19, 2007 Final Rejection) at 3.  On April 19, 2007, the applicant responded confirming it ***was*** interpreting the term very narrowly, and that this was intentional: "Applicant is interpreting the claims consistent with definitions in the specification. ***Applicant can be his own lexicographer***, and Applicant has defined the term 'image-modifying' and 'image-modifying data' in the specification."  Ex. 11, '520 File History (April 19, 2007 Amendment) at 16.

***Fourth***, on October 23, 2007, the applicant amended its claims and re-emphasized that "image-modifying data" is data that directly instructs the server and does not allow the server to make decisions.  Specifically, the applicant explained that "in Lee, the client sets the objective, and the server determines the details of how to achieve this objective.  The client application in Lee is not involved in the decision making."  Ex. 12, '520 File History (Oct. 23, 2007 Amendment) at 19.  In contrast, the applicant argued that "***the server in the current application is <u>not allowed</u> to make a decision.  It must follow the instructions sent by the client*** and contained in 'image modifying data.'"  *Id*. at 20.

***Fifth***, on April 18, 2008, the applicant amended its claims and re-iterated its position that the server in claim 1 makes no decisions about how the image should be modified.  In particular, the applicant stated "in Lee, the client sets the objective, and the server determines the details of how to achieve this objective.  The client application in Lee is not involved in the decision making."  Ex. 13, '520 File History (April 18, 2008 Amendment) at 17.  But, in contrast, "***the server in the current***

-6-

1  **application is <u>not allowed</u> to make a decision.  It must follow the instructions sent by**

2  **the client** and contained in 'image-modifying data.'"  *Id.*

3        Thus, the applicant made it unmistakably clear to a person of ordinary skill in

4  the art that the term "image-modifying data" must "directly instruct" the server how

5  the image should be modified so that the "server makes no decisions" about how the

6  image should be modified.  *See* Ex. 01 ("Fuchs Decl.") ¶¶ 45–56.

7        The applicant's repeated statements intentionally defining the scope of "image-

8  modifying data" are a prosecution disclaimer.  As the Federal Circuit instructs:

9  "Prosecution disclaimer 'preclud[es] patentees from recapturing through claim

10  interpretation specific meanings disclaimed during prosecution.'"  *Aylus Networks,*

11  *Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017).  "[W]here the patentee has

12  unequivocally disavowed a certain meaning to obtain his patent, the doctrine of

13  prosecution disclaimer attaches and narrows the ordinary meaning of the claim

14  congruent with the scope of the surrender."  *Omega Eng'g,* 334 F.3d at 1324.

15        Here, the applicant repeatedly and unambiguously confirmed in five separate

16  remarks to the Patent Office that the claimed "image-modifying data" directly

17  instructs the server how to modify the image such that the server is not allowed to

18  make decisions.  Permitting IPL now to reclaim subject matter it clearly disclaimed

19  would "undermin[e] the notice function" and frustrate competitors and the public who

20  were left "to draw the reasonable conclusion that the patentee was not seeking patent

21  protection" for image-related input data that a server must modify.  *SciMed Life Sys.,*

22  *Inc. v. Advanced Cardio. Sys., Inc.*, 242 F.3d 1337, 1347 (Fed. Cir. 2001).

23        **2)**     **IPL's construction of "image-modifying data" is incorrect**

24        IPL's proposed construction of image-modifying data is incorrect for the

25  following reasons.

26        **First**, IPL's proposed construction ignores the clear, unambiguous, and

27  repeated statements made during prosecution to distinguish the claimed image-

28

1    modifying data over the prior art and gain issuance of the patent.  Notably, IPL's

2    expert offers no opinion on this term; thus, Dr. Fuchs' opinion is unrebutted.  Further,

3    IPL's proposed construction, "input data used to create a modified image," would

4    encompass the prior art reference, Lee, which the applicant repeatedly represented did

5    not have the claimed image-modifying data.  As recognized by the patentee during

6    prosecution, "Lee states that 'information related to the intended use of data is

7    transmitted to this sever and this transmitted information is ***used by the server***

8    ***application program to modify the data***' (*Lee, col. 3, lines 18-21*)."  Ex. 13, '520 File

9    History (April 18, 2008 Amendment) at 17.  Under IPL's construction, Lee's

10   information would be considered "input data used to create a modified image."

11          ***Second***, IPL's proposed construction is inconsistent with the specification and

12   prosecution history of the asserted patents.  The applicant admitted that it acted as its

13   own lexicographer.  Ex. 11, '520 File History (April 19, 2007 Amendment) at 16.  As

14   recognized by the Federal Circuit, "the inventor's lexicography governs."  *Phillips*,

15   415 F.3d at 1316.  But IPL attempts to run away from the definitional statements in

16   the prosecution history by creating a new, broader definition from whole cloth.

17   Nothing in the specification or claims support IPL's proposed construction.

18          ***Third***, IPL's proposed construction is inconsistent with the claims of the '238

19   patent, which recite "image-modify data" as a distinct requirement separate from mere

20   "input data."  For example, independent claim 1 of the '238 patent recites "sending

21   image-modifying data corresponding to a generated image from a client device" (Ex.

22   06, '238 patent, claim 1), while dependent claim 3 recites "[t]he method of claim 1,

23   ***further comprising sending user input control signals*** to the server, which generates

24   3-dimensional graphics accordingly."  *Id.*, claim 3.  Similarly, independent claim 6

25   recites "receiving, at a server, image-modifying data" (*id*, claim 6), while dependent

26   claim 8 recites "[t]he method of claim 6, ***further comprising*** receiving, at the server,

27   input control signals generated by a user input device."  *Id.*, claim 8.  In yet a third

28

-8-

example, independent claim 15 recites "receiving, at the server image-modifying data" (*id.*, claim 15), while dependent claim 17 recites "[t]he system of claim 15, wherein the method ***further comprises*** receiving game control signals generated by a user input device." *Id.*, claim 17.  In each case, the dependent claim recites as a "further" step of the claimed method receiving an additional signal separate and distinct from "image-modifying data."  Contrary to IPL's argument, no claim recites in any form of words that the "image-modifying data" itself comprises "user input control signals" or "game control signals."  Having recited these as separate requirements, they are presumed distinct from one another.  *See, e.g.*, *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, (Fed Cir. 2008) ("Our precedent instructs that different claim terms are presumed to have different meanings"); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings"); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("[W]e must presume that the use of these different terms in the claims connotes different meanings").

Thus, a person of ordinary skill would understand that "image-modifying data" is different from "user input control signals" and "game control signals."  *See Becton Dickinson and Co. v. Tyco Healthcare Group LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language" is that those elements are 'distinct component[s]' of the patented invention.").  IPL's construction of image-modifying data as merely "input data used to create a modified image" violates these cannons of claim construction by improperly conflating "user input control signals" and "game control signals" with the separately-recited "image-modifying data."

-9-

## B.   "3-dimensional graphics processing" / "does not perform 3-dimensional graphics processing"

| Claim Term | Sony's Construction | IPL's Construction |
|---|---|---|
| 3-dimensional graphics processing '093 (claim 1) '238 (claims 1, 6, 15) | uses a 3D graphics renderer, or otherwise processes graphics in three dimensions | graphics processing necessary to render 3D geometric objects |

| Claim Term | Sony's Construction | IPL's Construction |
|---|---|---|
| does not perform 3-dimensional graphics processing | does not use a 3D graphics renderer, or otherwise process graphics in three dimensions | does not perform the graphics processing necessary to render 3D geometric objects |

Sony's proposed constructions reflect the applicant's clear and unmistakable statements to the Patent Office—made to overcome a prior art rejection—that client devices with a "3D graphics renderer" do not satisfy the claim limitation requiring that the client device "does not perform 3-dimensional graphics processing." By contrast, IPL's proposed construction ignores the file history and introduces unnecessary uncertainty.

During the prosecution of the '093 patent, the Examiner rejected claims 48–60 and 67 over U.S. Patent No. 6,603,470 ("Deering") in part because, according to the Examiner, Deering discloses a client that does not perform 3-dimensional graphics processing. Ex. 14, '093 File History (May 15, 2013 Non-Final Rejection).

In response, the applicant argued Deering does not satisfy this limitation because the client device in Deering "includes a 3-D graphics renderer." The applicant argued that Deering:

> does not teach the following aspect of claim [1]: 'wherein said client device does not perform 3-dimensional graphics processing on said at least one decompressed image.' Claim [1] recites, in pertinent part: displaying said at least one decompressed image at the display of said client device, *wherein said client device does not perform 3-dimensional*

-10-

1
2

> ***graphics processing on said at least one decompressed image***, and
> wherein said client device is separate from said server.

3  Ex. 15, '093 File History (Aug. 15, 2013 Amendment) at 5.  Specifically, the

4  applicant argued that Deering did not disclose "wherein said client device does not

5  perform 3-dimensional graphics processing on said at least one decompressed image."

6  *Id.* at 5–6.  The applicant pointed to Figure 1 of Deering (reproduced below), and

7  argued:

8
9
10
11
12
13
14
15

> Deering apparently ***teaches against such a feature*** because Fig. 1 of
> Deering clearly shows that Decoder system 40 ***includes a 3-D graphics
> renderer 140*** coupled to the 3- D graphics decompress 130. Thus, it is
> clear from Deering that the 'target clients or the decoder systems 40,'
> after receiving compressed 3-D images from a server 20, decompress[es]
> the 3-D images via 3-D graphics decompress 130 and then perform[s] 3-
> dimensional graphics processing on the decompressed images via 3-D
> graphics renderer 140. . . . Thus, based on the above reasoning, Applicant
> submit that the combination of Yamada and ***Deering does not teach
> 'wherein said client device does not perform 3-dimensional graphics
> processing on said at least one decompressed image,' as recited in
> claim [1]***.

16
17  *Id.* at 7.

18
19
20
21
22
23
24
25
26



27  *Id.* at 6-7 (Deering, Figure 1).

28

These statements are a clear and unmistakable disclaimer that the claims do not cover a client device that includes a "3-D graphics renderer."  The applicant stated that "Deering apparently teaches against such a feature because Fig. 1 of Deering clearly shows that Decoder system 40 includes a 3-D graphics renderer 140 coupled to the 3-D graphics decompress 130."  *Id.*  The applicant quoted the relevant claim language ("client device does not perform 3-dimensional graphics processing") and argued that the Deering system "includes a 3-D graphic renderer 140" and therefore, "Deering does not teach 'wherein said client device does not perform 3-dimensional graphics processing on said at least on decompressed image.'"  *Id.*; Fuchs Decl., Ex. 01 ¶¶ 67–74.

Thus, the patentee disclaimed client devices that include a 3D graphics renderer.  *Aylus Networks*, 856 F.3d at 1359 ("Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'"); *Omega Eng'g*, 334 F.3d at 1324 ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender").

Further, the applicant's disclaimer is consistent with the patent's statement of the purported advantages of the claimed invention, which contemplates a client that does not have "necessary hardware" for 3D graphics—that is, one that lacks a 3D graphics renderer.  *See* '093 at 9:6–8 ("The main advantages of this invention are: . . . [t]he ability to display complex 3D graphics on a device *lacking necessary hardware*.").  Indeed, according to the patent, the purported problem in the prior art was that "sophisticated three dimensional graphics *are not available on devices* such as mobile telephones and the set-top boxes used to decode cable and satellite television signals."  *Id.* at 8:40–45.  The specification also explains that "with the constant change of graphics languages and protocols, the hardware becomes obsolete

-12-

1   rather quickly, which adversely impacts the value of the client." *Id.* at 3:1–4.  Thus, it

2   is not surprising that the patentee disclaimed client devices with a 3D graphics

3   renderer—according to the specification, that was the problem the patent attempts to

4   avoid.

5        IPL's proposed construction of 3-dimensional graphics processing is incorrect.

6   IPL once again ignores statements made by the applicant during prosecution to

7   disclaim clients with 3D graphics renderers, which would "undermin[e] the notice

8   function of the patent" and frustrate competitors and the public, who were left "to

9   draw the reasonable conclusion that the patentee was not seeking patent protection"

10  over clients using 3-D graphics renderers.  *SciMed Life Sys.*, 242 F.3d at, 1347.

11       Further, IPL's construction requires a determination of what is "necessary to

12  render 3D geometric objects;" but this only introduces ambiguity because what

13  processes are "necessary" versus "unnecessary" is not set forth in the patent.  Thus,

14  IPL's construction would render the claim indefinite.  *Geneva Pharms., Inc. v.*

15  *GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (rejecting a proposed

16  construction because it would render the claim indefinite).

17      **C.**    **"3-dimensional graphics"**

| Claim Term | Sony's Construction | IPL's Construction |
|---|---|---|
| "3-dimensional graphics" ('093 claim 1); ('238, claims 1, 6, 15) | graphics in three dimensions | graphical images produced by rendering 3D geometric objects |

22       Sony's construction reflects the plain and ordinary meaning of the term,

23  whereas IPL's construction introduces unrecited limitations including "rendering" and

24  "3D geometric objects."

25       Both experts agree that the term 3-dimensional graphics is well-understood by a

26  person of ordinary skill in the art.  *See* Fuchs Decl., Ex. 01 ¶ 65; Hart Decl. (D.I. 78,

27  Exhibit B) ¶ 15.  Sony's construction—graphics in three dimensions—is consistent

28  

-13-

with the plain and ordinary meaning of 3-dimensional graphics, as confirmed by IPL's own extrinsic evidence. *See e.g.*, Ex. 16 *Webster's New World Dictionary of Computer Terms* (5th ed. 1994) (defining "three dimensional graphics (3D)" as "***graphic images in three dimensions*** – height, width, and depth."); Ex. 17 *IEEE Dictionary* (6th ed. 1996) (defining "three-dimensional graphics" as "the presentation of data on a two-dimensional display surface so that it ***appears to represent a three-dimensional model***, and can be viewed from any position"); Ex. 18 *The Illustrated Dictionary of Electronics* (2nd ed. 1982) (defining "three Dimensional" as "***having three dimensions*** (height, width, depth) or the appearance of this quality."); Ex. 19 Jennifer Coleman Dowling, *Multimedia Demystified* 29 (1st ed. 2011) ("3D animation presents objects and scenes ***in three-dimensional space***").

IPL's construction, on the other hand, requires that graphics must be produced by "rendering 3D geometric objects," which is an unrecited limitation that is not supported by the intrinsic record. Dr. Hart relies on '520 patent col. 1:20-37 in support of IPL's proposed construction, but this passage neither discusses 3D geometric objects nor states that 3D graphics must be those generated from rendering 3D geometric objects. Further, adding "rendering 3D geometric objects" unjustifiably complicates an already well-understood claim term. *See ProconGPS, Inc. v. Skypatrol, LLC*, No. C 11–03975 SI, 2012 WL 3276977, at *4–5 (N.D. Cal. Aug. 9, 2012) (finding "the term 'loan' does not require construction" because it was "as common a word as one could possibly encounter in a patent case"); *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal. 2007) ("The terms 'therapeutically effective' or 'therapeutically ineffective' are commonplace[.] . . . These terms do not need to be construed because they are neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history.").

-14-

### D.    "transmitting a link to identify the client device"

| Claim Term | Sony's Construction | IPL's Construction |
|---|---|---|
| "transmitting a link to identify the client device" ('826 claim 1) | Plain meaning | transmitting information to identify a client device |

The term should be given its plain and ordinary meaning because the patent sets forth no express intent to impart a different meaning for the term "link." *Va. Panel Corp. v. Mac Panel Co.*, 133 F.3d 860, 866 (Fed. Cir. 1997). The claims, specification and prosecution history do not provide a special meaning for the term "link." Thus, a person of ordinary skill would understand that "link" has its plain and ordinary meaning. Fuchs Decl., Ex. 01 ¶ 78.

In contrast, IPL's proposed construction seeks to replace "a link" with the far broader term "information." In other words, IPL seeks to remove the "link" limitation and stretch the claim to cover transmittal of *any* type of information (presumably to stretch the claims for infringement). But the patentee chose to limit the claims to a "link" and it is improper to now change the claim language unless there are clear and unmistakable statements in the intrinsic record to warrant such a change. There are no such statements, and a person of ordinary skill in the art would not understand "link" to broadly cover any type of information. Fuchs Decl., Ex. 01 ¶¶ 78-79. Even IPL's expert offers no opinion in support of IPL's construction.

### E.    The terms "complex interactive games" and "acceptable frame rate" are indefinite under 35 U.S.C. § 112

The terms "complex interactive games" and "acceptable frame rate" are indefinite because they are terms of degree without any objective boundaries set forth in the intrinsic record or otherwise known to a person of ordinary skill in the art.

-15-

1    The Supreme Court has held that under 35 U.S.C. § 112, "a patent is invalid for

2    indefiniteness if its claims, read in light of the patent's specification and prosecution

3    history, fail to inform, with reasonable certainty, those skilled in the art about the

4    scope of the invention." *Nautilus*, 572 U.S. at 898–99.  "[A] patent must be precise

5    enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of

6    what is still open to them.'  Otherwise there would be '[a] zone of uncertainty which

7    enterprise and experimentation may enter only at the risk of infringement claims.'"

8    *Id.* at 909–10 (internal quotations and citations omitted).

9    Under the Supreme Court's *Nautilus* standard, "terms of degree" (such as

10   "complex" and "acceptable") are indefinite where the patent fails to provide

11   "objective boundaries for those of skill in the art" to understand the scope of the

12   claim.  *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371–74 (Fed. Cir.

13   2014) (holding that "unobtrusive manner" is indefinite where the patent lacked

14   objective boundaries); *GE Lighting Sols., LLC v. Lights of Am. Inc.*, 663 F. App'x

15   938, 940 (Fed. Cir. 2016) (unpublished disposition) ("'Elongated' is undoubtedly a

16   term of degree. . . . [T]he patent must provide 'some standard for measuring that

17   degree' such that the claim language 'provide[s] enough certainty to one of skill in the

18   art when read in the context of the invention.'").

19        **1.    "complex interactive games"**

| Claim Term | Sony's Construction | IPL's Construction |
|---|---|---|
| "complex interactive games" ('238 claims 1, 6, 15) | indefinite | games which produce 3D graphics in which a client device sends input signals and a stream of one or more 3D graphic images are generated in response |

1    The term "complex interactive games" is indefinite because it is a term of

2    degree and there are no objective boundaries set forth in the intrinsic record.  *Interval*

3    *Licensing*, 766 F.3d at 1371–74.

4    Courts have repeatedly found claim terms like "complex" to be terms of degree.

5    Examples include: "**unobtrusive**" (*Interval Licensing*, 766 F.3d at 1374); "**fragile**"

6    (*Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1252–53 (Fed. Cir. 2008));

7    "**relatively short**" (*Semcon IP Inc. v. Huawei Device USA Inc.*, Case No. 2:16-cv-

8    00437-JRG-RSP, 2017 WL 2972193, at *25 (E.D. Tex. Jul. 12, 2017)); "**relatively**

9    **large**" (*Rovi Guides, Inc. v. Comcast Corp.*, Case No. 16-cv-9278 (JPO), 2017 WL

10   3447989, at *13–14 (S.D.N.Y. Aug. 10, 2017)); "**detailed**" (*Id.* at *18); "**closely**

11   **matching**" (*Nexus Display Techs. LLC v. Dell Inc.*, Case No. 2:14-cv-762, 2015 WL

12   5578735, at *7–8 (E.D. Tex. Sept. 22, 2015)); "**quite small**" (*Innovative Display*

13   *Techs. LLC v. Acer Inc.*, Case No. 2:13-cv-522-JRG, 2014 WL 4230037, at *25–26

14   (E.D. Tex. Aug. 26, 2014)); "**concentrated**" (*Signal IP v. Am. Honda Motor Co.*, No.

15   14-cv-02454-JAK (JEMx), 2015 WL 5768344, at *23–25 (C.D. Cal. Apr. 17, 2015));

16   and "**suitable**" (*In the Matter of Certain Wireless Standard Compliant Elec. Devices*,

17   ITC Inv. No. 337-TA-953, USITC Order No. 29 (Oct. 23, 2015) (Markman Order)).

18   Just like the terms struck down as indefinite in these precedents, whether a particular

19   interactive game would be considered complex is entirely subjective.  *See* Fuchs

20   Decl., Ex. 01 ¶ 22.  To illustrate, one person of ordinary skill in the art might believe

21   chess is simple because the rules and how the pieces move are simple, but another

22   might believe chess is complex due to the vast number of possible board positions.

23   Because "complex" is a term of degree, the intrinsic record must set forth

24   "objective boundaries for those skilled in the art" to measure that degree and

25   understand the boundary between what is "complex" and what is not.  *Interval*

26   *Licensing*, 766 F.3d at 1371–74; *GE Lighting*, 663 F. App'x at 940.  But the '238

27   patent provides none.  In fact, the term "complex interactive games" does not even

28

appear in the specification.  The patent contains no discussion of game complexity, or even a single example of a game that would meet this claim limitation.  The prosecution history also lacks any discussion of game complexity.  Moreover, as explained by Dr. Fuchs, there are no industry standards or rubrics available to a person of ordinary skill for measuring game complexity.  Fuchs Decl., Ex. 01 ¶ 22.

The Federal Circuit has consistently found terms to be indefinite in this very situation.  In *Interval Licensing*, for example, the Federal Circuit held that "unobtrusive manner" was indefinite where the patent failed to provide any objective boundaries for determining the scope of the term.  *Interval Licensing*, 766 F.3d at 1373–74.  Without objective boundaries, "a skilled artisan is . . . left to wonder what other forms of display are unobtrusive[.] . . .  The specification offers no indication, thus leaving the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion.'"  *Id.* at 1374.  Here, just like *Interval Licensing*, the '238 patent lacks any indication of what types of games are "complex" and what games are not "complex," and thus a skilled artisan would also be "left to wonder" and forced to "consult the unpredictable vagaries of any one person's opinion."  *Id.*

The Federal Circuit found similar terms to be indefinite in *Halliburton* and *GE Lighting*.  In *Halliburton*, the Federal Circuit found the term "fragile gel" indefinite because the specification did not "identify the degree of fragility."  *Halliburton*, 514 F.3d at 1253, 1256.[3]  In *GE Lighting*, the Federal Circuit found a term of degree ("elongated") indefinite where the specification and prosecution history lacked any objective boundaries for determining the degree.  *GE Lighting*, 663 F. App'x at 940–41.  Here, just as in *Halliburton* and *GE Lighting*, the '238 patent does not identify

---

[3]  *Halliburton* found the term indefinite under the stricter "insolubly ambiguous" standard, which has since been replaced by the Supreme Court's "reasonable certainty" standard in *Nautilus*.

1  any yardstick for evaluating complexity such that a person of ordinary skill can

2  determine which interactive games are complex or not complex.

3     Within this District, Judge Kronstadt's analysis in *Signal IP* is also instructive.

4  The court there held the term "concentrated" to be indefinite because "[n]othing in the

5  claims or specification allows a person of skill in the art to know the 'objective

6  boundaries' of the claim: whether 75%, 51%, or 33% of the force counts as

7  'concentrated' in one group."  *Signal IP*, 2015 WL 5768344, at *25 (internal citations

8  omitted).  Just as in *Signal IP*, a person of skill in the art is given no ability determine

9  when the "complexity" of a game crosses the "complex interactive games" threshold.

10  Indeed, "complex interactive games" is even more problematic than the term found

11  indefinite in *Signal IP* because, unlike the percentages for "concentrated," there are no

12  metrics in the claims or specification for quantifying the complexity of a game.  Fuchs

13  Decl., Ex. 01 ¶¶ 22, 24

14     Numerous district court decisions have held similar terms of degree indefinite.

15  *See, e.g.*, *Semcon IP*, 2017 WL 2972193, at *25 ("'Relatively short messages' is a

16  term of degree and the '876 Patent does not provide an objective standard by which to

17  determine if a message is 'relatively short'"); *Rovi Guides*, 2017 WL 3447989, at *14

18  ("while the term 'relatively large set of selectable television content items' is not a

19  purely subjective term, the written description does not provide sufficient support to

20  inform with reasonable certainty those skilled in the art of the scope of the

21  invention"); *Nexus Display*, 2015 WL 5578735, at *8 ("the specification fails to

22  provide objective boundaries for determining whether a data rate 'closely match[es]'

23  another data rate"); *Innovative Display*, 2014 WL 4230037, at *26 ("In the absence of

24  any objective criteria for evaluating what on its face is a purely subjective term, the

25  disputed term [quite small] is indefinite."); *Aubin Indus. v. Caster Concepts, Inc.*,

26  Case No. 2:14-cv-02082-MCE-CKD, 2015 WL 4284715, at *7 (E.D. Cal., Sept. 27,

27  2017) ("Here we have . . . a 'closely spaced relationship.'  That raises the question of

28

-19-

1  just how close the relationship needs to be to fall within the term's purview. . . .

2  [O]nce the term 'closely' is inserted the relationship becomes impossible to

3  adequately define.").  Accordingly, the term "complex interactive games" is

4  indefinite.

5       IPL's proposed construction seeks to side-step indefiniteness by simply

6  removing the term "complex" altogether.  IPL's expert, Dr. Hart, argues for example

7  that the patents "effectively equate the term 'complex' with the processing of 3D

8  graphics."  Hart Decl. (D.I. 78, Exhibit B) ¶ 21.  In other words, Dr. Hart seeks to re-

9  define the plain meaning of "complex" with a definition unique to this patent that

10  means "processing of 3D graphics."  But the law is clear that there must be clear and

11  unmistakable statements in the intrinsic record for such lexicography.  *See Openwave*

12  *Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015) (requiring a disclaimer

13  "both so clear as to show reasonable clarity and deliberateness, and so unmistakable as

14  to be unambiguous evidence of disclaimer.").  Not only is there no such definition of

15  "complex" in the '238 patent, IPL's construction conflicts with the claims, the

16  specification, and the understanding of a person of ordinary skill in the art.

17       ***First***, the claims themselves demonstrate that IPL's proposed construction is

18  improper.  *Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial

19  guidance as to the meaning of particular claim terms").  The claims in which

20  "complex interactive games" appear already recite "3-dimensional graphics" and "3-

21  dimensional graphics processing."  *E.g.*, '238, claim 1.  Thus, it would be nonsensical

22  to construe "complex" to ***also*** mean "3-dimensional graphics" since the patentee

23  already knew how to recite "3-dimensional graphics" and did so where intended.

24       ***Second***, the '238 patent lacks any statements that rise to the level of

25  lexicography or clear and unmistakable disclaimer.  *See Openwave Sys.*, 808 F.3d at

26  513.  Rather, each passage that Dr. Hart relies upon simply uses the term "complex 3-

27  dimensional graphics."  Hart Decl. (D.I. 78, Exhibit B) ¶¶ 21-23; '238 at Abstract,

28

-20-

3:20-27, 7:9-13, 9:1-3, 9:8-11, 8:33-35. Those portions do not set forth a special lexicography for "complex" to mean "3-dimensional graphics," nor would a person of ordinary skill understand that to be the case. Fuchs Decl., Ex. 01 ¶¶ 30-31. To the contrary, a person of ordinary skill would understand the cited disclosures to simply state that certain 3-dimensional graphics are complex, *which implies that other 3-dimensional graphics are not complex*. *See Phillips*, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

*Third*, "complex 3D graphics" itself is a term of degree, and whether a particular 3D graphic is complex or not is also subjective. Fuchs Decl., Ex. 01 ¶ 23. Here too, the specification includes no discussion or examples to inform what types of 3D graphics are "complex" and what types are not. The specification contains no sample images of 3D graphics and has no discussion of how to measure or determine complexity of 3D graphics. Further, as Dr. Fuchs explained, there are no industry standards in the field of computer graphics from which to determine whether 3D graphics are complex or not complex. Fuchs Decl., Ex. 01 ¶ 24, 30–31.

Dr. Hart's reliance on a prior art reference cited during prosecution also does not support re-drafting the claim to remove the term "complex." Dr. Hart relies on a prior art reference called Deering, which was cited during prosecution of the parent '520 patent. Dr. Hart relies on Deering's disclosure of how its 3D graphics may be more complex than 2D graphics. Hart Decl. (D.I. 78, Exhibit B) ¶ 22. But the portion of Deering upon which Dr. Hart relies was never mentioned by the patentee (or anyone else) during prosecution. Thus, the mere fact Deering was cited during prosecution does not indicate that the patentee clearly and unmistakably re-defined the term "complex" to mean "3D graphics." *See Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017) (holding that a disclaimer must be "clear and unmistakable to one of ordinary skill in the art").

-21-

Dr. Hart also relies on an extrinsic textbook that explains that "3D applications are typically much more sophisticated and complex [than 2D animation]."  Hart Decl. (D.I. 78, Exhibit B) ¶ 23.  However, the cited portion does not support IPL's construction because (1) the claim term is "complex interactive *games*," not complex "graphics"; and (2) Dr. Hart's cited text does not equate complex games to games with 3D graphics.  Moreover, the premise that all 3D graphics are complex relative to 2D graphics is false, as explained by Dr. Fuchs.  Fuchs Decl., Ex. 01 ¶¶ 32-34 (showing how 2d graphics can be as complex as 3d graphics).  Finally, whether 3D graphics are *relatively* more complex than 2D graphics does not answer the question whether a given "*game*" is "complex" under the patent.

In sum, "complex interactive games" is a term of degree and the intrinsic record fails to provide the required objective boundaries to inform a person of ordinary skill of the claim's scope with reasonable certainty.  Under *Nautilus* and *Interval Licensing*, the term is indefinite.

### 2.    "acceptable frame rate"

| Claim Term | Sony's Construction | IPL's Construction |
|---|---|---|
| "acceptable frame rate" ('238 claims 14, 20) | indefinite | at a rate that conveys smooth motion |

The term "acceptable frame rate" is indefinite because it is a term of degree and there are no objective boundaries set forth in the intrinsic record.  *Interval Licensing*, 766 F.3d at 1371–74.

Whether a frame rate is "acceptable" or not is a term of degree.  *See Interval Licensing*, 766 F.3d at 1370 ("The key claim language at issue . . . includes a term of degree ('unobtrusive manner').");  *In the Matter of Certain Wireless Standard Compliant Elec. Devices*, 2015 WL 13310467, at *25 (analyzing "suitable level" as a term of degree).  Here, whether any given frame rate is deemed "acceptable" is entirely subjective as it varies depending on the viewer and the application in

-22-

question.  Fuchs Decl., Ex. 01 ¶ 38 (explaining that in some applications, 1-2 frames per second may be acceptable, but in other applications, anything less than 30 frames per second may not be).  Thus, the patent must provide some objective yardstick against which a person of ordinary skill can measure "acceptability."  *Interval Licensing LLC*, 766 F.3d at 1371–74; *GE Lighting*, 663 F. App'x at 940.

But once again, the '238 patent has none.  The specification does not even contain the phrase "frame rate" much less any discussion of what frame rates are deemed to be acceptable.  Nor is there any discussion of frame rates in the prosecution history.

The claim term is thus invalid under *Nautilus*, *Interval Licensing*, and the numerous cases discussed above in Section A.1.  For example, in *In the Matter of Certain Wireless Standard Compliant Elec. Devices*, the term at issue was "a ***suitable level*** of anti-sparseness modification."  The Administrative Law Judge found that, because there was "no disclosure explaining what degree of anti-sparseness modification would be suitable or unsuitable," the patent disclosed "no objective boundaries" and the claims were thus indefinite.  2015 WL 13310467, at *25–26.  The term "acceptable frame rate" is directly analogous to "suitable level of anti-sparseness modification":  both terms require a subjective determination of what is deemed "acceptable" or "suitable."  And in both cases, the patents fail to provide any objective boundaries for determining acceptability or suitability.  Because a person of ordinary skill is "left to wonder" what is "acceptable" and what is not, and forced to "consult the unpredictable vagaries of any one person's opinion" as to whether a given frame rate is "acceptable," this term is indefinite.  *Interval Licensing*, 766 F.3d at 1373–74.

IPL's proposed construction, "at a rate that conveys smooth motion," is not only unsupported, but introduces additional uncertainty.  There is no intrinsic support for defining "acceptable frame rate" to mean "at a rate that conveys smooth motion."  The claims, specification, and prosecution history do not discuss "smooth motion" (or

-23-

even discuss motion at all), much less relate the concept of smooth motion to an
"acceptable frame rate."  As explained above, the patent has no discussion of frame
rates whatsoever.

Thus, it is not surprising that Dr. Hart relies solely on extrinsic evidence.  But
even the extrinsic evidence he cites does not support IPL's construction.  Dr. Hart
primarily relies on a textbook that he contends "defines the minimally acceptable
frame rate to convey smooth motion."  Hart Decl. (D.I. 78, Exhibit B) ¶ 26.  But the
textbook itself says no such thing.  The quoted section merely says that "a sequence of
frames displayed at more than 15 frames per second can convey smooth motion or
changing form **better than** can a jerky sequence, with several seconds between
individual frames."  *Id.*  Critically, the textbook does **not** state what Dr. Hart attributes
to it: that "more than 15 frames per second" is an established "minimally acceptable
frame rate to convey smooth motion."  Rather, the textbook merely states that
animation at higher than 15 frames per second is smoother **when compared to**
animation with "several seconds between individual frames."  There is no discussion
of minimum level of acceptability.

More importantly, the patent never once suggests that the criterion for
measuring "acceptability" is limited to "smoothness" of "motion."  As Dr. Fuchs
points out, there are circumstances where "smooth motion" is irrelevant—including in
medical imaging applications where higher image quality is more important than
frame rate.  Fuchs Decl., Ex. 01 ¶ 38.  Because the patent never once relates
acceptability to "smooth motion," it is improper for IPL now to attempt to invent its
own (narrow, litigation-driven) yardstick to try and save this term under § 112.  *Pfizer,
Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006) ("[W]e should not
rewrite claims to preserve validity.").

Dr. Hart also relies on a web page (notably authored by someone who is **not** in
the field of animation or computer graphics), which claims—without citation—that

"our brains can make a continuous moving picture with as little as 16 fps. . . ."  Hart
Decl. (D.I. 78, Exhibit B) ¶ 26.[4]  Because this web page is not from the same technical
field, it does nothing to inform how a person of ordinary skill in the art would read the
'238 patent's claims.  Moreover, the article does not support the conclusion Dr. Hart
seeks to draw because the web page ***never*** once asserts that 16 frames per second is an
"acceptable frame rate."  Nor does it suggest that the criterion for measuring
"acceptability," as claimed in the '238 patent, is limited to whether motion is
"continuous" or not.

Indeed, it remains a mystery how Dr. Hart selected 16 fps as his yardstick for
"acceptability" because the very web page he cites mentions multiple different frame
rates—*e.g.*, 24 frames per second for film, 30 frames per second for NTSC (National
Television System Committee) video.  *Id.*  And other publications that Dr. Hart cites
describe 24 frames per second as the "basis of timing in animation."  *Id.*  In sum, the
claims, specifications, file history, and even IPL's own extrinsic evidence do not
support IPL's proposed construction.  Finally, even assuming that "acceptable frame
rate" means "at a rate that conveys smooth motion," the term would still be indefinite.
Whether an animation "conveys ***smooth*** motion" is subjective and itself a term of
degree, and the intrinsic record does not provide objective boundaries for how to
determine when motion is "smooth" versus something else.

In sum, "acceptable frame rate" is indefinite under *Nautilus* and  *Interval
Licensing* because it is a term of degree and the intrinsic record fails to provide the
required objective boundaries to inform a person of ordinary skill as to the claim's
scope with reasonable certainty.

---

[4] Available at https://aframe.com/blog/2013/07/a-beginners-guide-to-frame-rates/ (last
visited March 23, 2020).

-25-

1

2     Dated:  March 23, 2020                    By: /s/  *Mark D. Flanagan*

3                                                   Mark D. Flanagan (SBN 130303)
                                                    Mark.Flanagan@wilmerhale.com
4                                                   Joseph F. Haag (SBN 248749)
                                                    Joseph.Haag@wilmerhale.com
5                                                   S. Dennis Wang (SBN 261296)
                                                    Dennis.Wang@wilmerhale.com
6                                                   **WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP**
7                                                   950 Page Mill Road
                                                    Palo Alto, CA 94304
8                                                   Telephone: (650) 858-6000
                                                    Fax: (650) 858-6100
9

10                                                  James M. Dowd (SBN 259578)
                                                    James.Dowd@wilmerhale.com
11                                                  **WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP**
12                                                  350 South Grand Ave., Suite 2100
                                                    Los Angeles, CA 90071
13                                                  Telephone: (213) 443-5393
                                                    Fax: (213) 443-5400
14

15                                                  *Attorneys for Defendant Sony Interactive
                                                    Entertainment LLC*

16

17

18

19

20

21

22

23

24

25

26

27

28